**22-10139**

# In the United States Court of Appeals for the Ninth Circuit

————————

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

v.

KENNETH RUFUS CROWE,
DEFENDANT-APPELLANT.

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF GUAM
NO. 1:18-CR-10 (FRANCES TYDINGCO-GATEWOOD, C.J.)

————————

ANSWERING BRIEF FOR THE UNITED STATES

————————

SHAWN N. ANDERSON
United States Attorney

STEPHEN F. LEON GUERRERO
Assistant United States Attorney

MARIE L. MILLER
Special Assistant United States
    Attorney
United States Attorney's Office
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagåtña, Guam 96910
(671) 472-7332

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

FRANCESCO VALENTINI
Trial Attorney
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT .......................................................... 1

BAIL STATUS .................................................................................. 2

STATEMENT OF THE ISSUE .............................................................. 2

STATEMENT OF THE CASE ............................................................... 2

      A.    Factual Background ................................................. 4

      B.    Proceedings Below ................................................. 7

           1.    The Charges ............................................... 7

           2.    Crowe's Attempts to Delay Trial ..................... 7

                 a.    Crowe's Motion To Disqualify The Prosecution Team ................................... 8

                 b.    Lujan's First Asserted Illness .................. 12

                 c.    Lujan's Second Asserted Illness .............. 12

           3.    Lujan's Purported "Ethical" Issue And Refusal To Continue Without A Mid-trial Continuance ............................................... 13

           4.    Crowe's Motion To Dismiss .............................. 22

SUMMARY OF ARGUMENT ............................................................. 22

ARGUMENT ................................................................................... 26

      THE DISTRICT COURT'S DENIAL OF CROWE'S MOTION TO DISMISS ON DOUBLE JEOPARDY GROUNDS SHOULD BE AFFIRMED ............................................. 26

A. Standard Of Review ....................................................... 27

B. The District Court's Ruling Should Be Affirmed ........ 27

   1. Legal Principles .................................................. 27

   2. By Requesting A "Mistrial For The Entire Case" Absent A Continuance, Crowe Consented To Retrial Before A Different Jury ..................................................................... 29

   3. In The Alternative, The District Court's Severance Order Was Supported By Manifest Necessity ............................................ 36

      a. The Manifest Necessity Inquiry ................ 36

      b. The District Court's Determination That The Circumstances "Necessitat[ed]" Crowe's Severance Is Entitled To Substantial Deference ........... 40

      c. Under Any Degree of Deference, There Was Manifest Necessity For Crowe's Severance ..................................................... 42

      d. Crowe's Remaining Arguments Lack Merit ............................................................. 49

C. In The Alternative, The Court Should Remand The Case And Instruct That The District Court Conduct A Manifest Necessity Analysis In The First Instance ............................................................... 57

CONCLUSION ......................................................................... 58

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF RELATED CASES

ii

# TABLE OF AUTHORITIES

## Cases

*Abney v. United States,*
431 U.S. 651 (1977) ........................................................................ 1, 35

*Arizona v. Washington,*
434 U.S. 497 (1978) .......................... 25, 28, 36, 37, 38, 39, 40, 41, 42, 47

*Crist v. Bretz,*
437 U.S. 28 (1978) ................................................................................ 31

*Gori v. United States,*
367 U.S. 364 (1961) ........................................................................ 40, 48

*Illinois v. Somerville,*
410 U.S. 458 (1973) .............................................................................. 40

*Johnson v. Buckley,*
356 F.3d 1067 (9th Cir. 2004) .............................................................. 51

*Midland Asphalt Corp. v. United States,*
489 U.S. 794 (1989) .............................................................................. 35

*Richardson v. United States,*
468 U.S. 317, 322 (1984) ........................................................................ 1

*Sovak v. Chugai Pharm. Co.,*
280 F.3d 1266 (9th Cir. 2002) .............................................................. 50

*Townsend v. Sain,*
372 U.S. 293 (1963), *overruled by*
*Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992) ........................................ 53

*United States v. Allick,*
274 Fed. Appx 128 (3d Cir. 2008) ........................................................ 58

*United States v. Bates,*
917 F.2d 388 (9th Cir. 1990) ................ 27, 28, 37, 39, 42, 43, 47, 48, 55

*United States v. Bonas,*
344 F.3d 945 (9th Cir. 2003) ........................................................ 27, 28

*United States v. Chapman,*
524 F.3d 1073 (9th Cir. 2008) ..................... 27, 29, 32, 37, 38, 39, 40, 41

*United States v. Cortez-Arias,*
403 F.3d 1111 (9th Cir. 2005) ................................................. 25, 29, 50

*United States v. Depue,*
912 F.3d 1227 (9th Cir. 2019) (en banc) .............................................. 51

*United States v. DiFrancesco,*
449 U.S. 117 (1980) ....................................................................... 24, 37

*United States v. Hollywood Motor Car Co., Inc.,*
458 U.S. 263 (1982) .............................................................................. 35

*United States v. Jorn,*
400 U.S. 470 (1971) ............................................... 28, 37, 40, 43, 47, 48

*United States v. Layton,*
645 F.2d 681 (9th Cir. 1981) ................................................................ 35

*United States v. MacDonald,*
435 U.S. 850 (1978) ............................................................................... 1

*United States v. Meza-Soria,*
935 F.2d 166 (9th Cir. 1991) ................................................................ 52

*United States v. Muhammad,*
498 Fed. Appx 251 (4th Cir. 2012) ...................................................... 58

*United States v. Newton,*
327 F.3d 17 (1st Cir. 2003) ...................................................... 32, 33, 34

*United States v. Perez,*
116 F.3d 840 (9th Cir. 1997) (en banc) .......................................... 25, 50

*United States v. Sanders,*
591 F.2d 1293 (9th Cir. 1979) .............................................................. 52

iv

*United States v. Schaff,*
   948 F.2d 501 (9th Cir. 1991)................................................................50

*United States v. Scott,*
   437 U.S. 82 (1978) ...........................................................................31

*United States v. Shaw,*
   829 F.2d 714 (9th Cir. 1987)...............................................................44

*United States v. Smith,*
   621 F.2d 350 (9th Cir. 1980).............................................29, 37, 43

*United States v. Taylor,*
   881 F.2d 840 (9th Cir. 1989)...............................................................35

*Wade v. Hunter,*
   336 U.S. 684 (1949) ............................................................27, 28, 31

## Statutes and Constitutional Provisions

U.S. Const. amend. V ...............................................................................27

18 U.S.C. 2 .................................................................................................3

18 U.S.C. 371 .............................................................................................2

18 U.S.C. 1001 ...........................................................................................2

18 U.S.C. 1343 ...........................................................................................3

18 U.S.C. 1346 ...........................................................................................3

18 U.S.C. 1349 ...........................................................................................3

18 U.S.C. 1519 ...........................................................................................2

18 U.S.C. 3144 ...........................................................................................8

18 U.S.C. 3231 ...........................................................................................1

28 U.S.C. 1291 ...........................................................................................1

v

49 U.S.C. 46306 ............................................................................. 3

**Rules and Regulations**

14 C.F.R. § 43 ................................................................................ 3

Fed. R. App. P. 4 ......................................................................... 1

Fed. R. Crim. P. 14 ............................................................... 35, 36

Fed. R. Crim. P. 15 ....................................................................... 8

## JURISDICTIONAL STATEMENT

This is an interlocutory appeal by a criminal defendant under *Abney v. United States*, 431 U.S. 651 (1977). Defendant Kenneth Rufus Crowe appeals from the district court's denial of his motion to dismiss the indictment under the Double Jeopardy Clause of the Fifth Amendment. 3-ER-282-285.[1] The district court, which had jurisdiction under 18 U.S.C. 3231, denied the motion on May 25, 2022. *Ibid.* Crowe filed a timely notice of appeal on June 1, 2022. 2-ER-91; *see* Fed. R. App. P. 4(b)(1)(A)(i). Although Crowe's claim fails on the merits, it appears to satisfy the "colorable" and "nonfrivolous" bar for interlocutory appeals of denials of motions to dismiss on double jeopardy grounds. *See Richardson v. United States*, 468 U.S. 317, 322 (1984) ("[T]he appealability of a double jeopardy claim depends upon its being at least 'colorable'" and "'[non]frivolous.'" (quoting *United States v. MacDonald*, 435 U.S. 850, 862 (1978), and *Abney*, 431 U.S. at 662 n.8). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. 1291 and the collateral-order doctrine.

---

[1] Citations are to Crowe's Excerpts of Record (ER), the government's Supplemental Excerpts of Record (SER), and the docket entries (Dkt. No.) in Case No. 1:18-cr-10 (D. Guam).

## BAIL STATUS

Crowe is out of custody on bail.  *See* Dkt. Nos. 13, 17-18.

## STATEMENT OF THE ISSUE

Whether the district court erred in denying Crowe's motion to dismiss the indictment on double jeopardy grounds, where the district court severed Crowe from his three codefendants during trial after Crowe's sole defense counsel stated on the record that he was resigning from representing Crowe.

## STATEMENT OF THE CASE

In May 2018, a federal grand jury in the District of Guam charged Crowe and several codefendants with numerous offenses arising out of a scheme to circumvent Federal Aviation Administration (FAA) safety requirements to reduce the costs and maximize the profits of a helicopter company, Hansen Helicopters.  *See* 1-SER-82.  A second superseding indictment, which the grand jury returned in January 2021, charged Crowe with conspiracy to defraud the FAA and the National Transportation Safety Board (NTSB), in violation of 18 U.S.C. 371 (Count 1); three counts of destroying, altering, or falsifying records, in violation of 18 U.S.C. 1519 (Counts 2 to 4); two counts of making false statements, in violation of 18 U.S.C. 1001(a)(2) (Counts 6 and 7); four counts of

aircraft parts fraud, in violation of 18 U.S.C. 38 (Counts 8 to 11); seventy-nine counts of employing a mechanic without a mechanic's certificate, in violation of 49 U.S.C. 46306(b)(8) and 14 C.F.R. § 43 (Counts 14 to 75 and 77 to 93); two counts of employing a pilot without a pilot's certificate, also in violation of 49 U.S.C. 46306(b)(8) and 14 C.F.R. § 43 (Counts 94 and 95); two counts of registration violations involving helicopters, in violation of 49 U.S.C. 46306(b)(3) (Counts 96 and 97); one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. 1349 (Count 99); and five counts of wire fraud, in violation of 18 U.S.C. 1343, 1346, and 2 (Counts 100 to 104). 2-ER-44-90.[2]

On February 15, 2022, Crowe, two individual codefendants, and a corporate codefendant (Hansen Helicopters) proceeded to trial, which was expected to last several weeks. Dkt. No. 1341. On March 11, 2022, with jury selection still underway,[3] the district court rejected Crowe's motion to disqualify the prosecution team (1-SER-2), which Crowe had

---

[2] Two additional counts (Counts 76 and 98) were dismissed before trial. *See* Dkt. No. 1208 (Count 98), Dkt. No. 1053 at 5-6 (Count 76).

[3] The district court conducted jury selection on February 15, 16, 17, and 18, 2022, and then resumed it on March 8, 2022. Dkt. Nos. 1341-1342, 1354-1355, 1377.

filed only days earlier (1-SER-25), and a jury was empaneled and sworn in on March 14, 2022 (Dkt. No. 1399). On March 21, 2022, Crowe—whose defense attorney, David Lujan, had already delayed the trial twice in the previous two weeks for asserted health reasons—requested another continuance, claiming that he needed time to research and seek advice on a purported "ethical duty" (1-ER-8) issue that had arisen over the weekend. 1-ER-7; 3-ER-301, 306-307, 311-312. The district court denied Crowe's request for a continuance. 1-ER-7-8; 3-ER-306-307. Then, after Lujan stated on the record that he was going to resign as Crowe's defense counsel, the court severed Crowe from his codefendants' trial. 1-ER-28, 32.

In May 2022, Crowe moved to dismiss all charges against him on double jeopardy grounds. Dkt. No. 1528. The district court denied Crowe's motion. 3-ER-282-285. This interlocutory appeal followed.

### A. Factual Background

This case arises from a long-running scheme to maximize the profits and reduce the costs of Hansen Helicopters, a Guam-based company that provides helicopter services internationally, by lying to the

FAA, the NTSB, and Hansen's customers about critical safety aspects of Hansen's operations. *See* 2-ER-44-90.

Hansen's services included providing helicopters, along with pilots and mechanics, to tuna boat companies that used the aircraft to spot fish in the Pacific Ocean. 2-ER-77-79. Crowe was Hansen's Director of Operations, as well as the Chief Pilot and Manager of two Hansen-related entities. 2-ER-51. Two of Crowe's codefendants, John D. Walker and Phillip T. Kapp, were also officers of Hansen. *Ibid.* As part of the scheme charged in the operative indictment, Crowe, Walker, Kapp, and others conspired to buy helicopters that had previously been destroyed, scrapped, or otherwise deemed not airworthy to use as purported legitimate civil aircraft for profit, without making proper repairs. 2-ER-54. To that end, the coconspirators falsified and concealed material facts from the FAA and NTSB. *Ibid.* They made materially false and fraudulent statements to the FAA to obtain registrations and "Airworthiness Certificates." *Ibid.* They deregistered—and then reregistered—helicopters with the FAA and other civil aviation authorities, including aviation authorities in the Philippines and New Zealand, to avoid inspection, oversight, and detection of their

misrepresentations. 2-ER-55. They operated helicopters that were not registered in any jurisdiction. *Ibid.* They switched "data plates"[4] from their associated helicopter parts. *Ibid.* They hired uncertified mechanics and pilots to work on and operate Hansen's helicopters, exacerbating the safety risk of operating those aircraft. *Ibid.* They purchased, imported, installed, and operated helicopters with counterfeit parts. *Ibid.* And they bribed an FAA inspector. *Ibid.*

As part of the scheme, Hansen and the individual defendants enriched themselves by leasing helicopters that purportedly met FAA requirements and airworthiness standards when, in fact, the helicopters did not meet those requirements and were un-airworthy. 2-ER-77. In exchange for their fraudulent helicopter services, between 2000 and May 2018, the defendants and their controlled entities received from their customers at least $300 million in payments. 2-ER-79-80. The scheme put lives and property at grave risk. 2-ER-54. As a result of Crowe's and his codefendants' criminal activities and disregard for aviation safety,

---

[4] "Data plates" are FAA-required fireproof identification plates that are affixed to major aircraft components (*e.g.*, engines, transmissions, gearboxes, etc.). 2-ER-49. They allow investigators to positively identify aircraft parts and trace their maintenance records. *Ibid.*

several people died, and many more were injured, in accidents involving Hansen's helicopters. *Ibid.*

## B. Proceedings Below

### 1. The Charges

In May 2018, a grand jury in the District of Guam charged Crowe, Walker, Kapp, and another individual with several offenses in connection with the scheme described above. 1-SER-78-95. The indictment was superseded twice (*see* Dkt. Nos. 369, 862) and ultimately charged Crowe with the offenses described above. 2-ER-44-90. In addition to Crowe, the second superseding indictment charged Walker, Kapp, three other individuals, Spares, Inc. (the counterfeit parts manufacturer, which has since pleaded guilty), and Hansen Helicopters. *Ibid.* After several continuances, a joint trial of Crowe, Walker, Kapp, and Hansen was set for March 7, 2022, with jury selection to begin on February 15, 2022. Dkt. Nos. 1208, 1341.

### 2. Crowe's Attempts To Delay Trial

In February and early March 2022, with jury selection underway, Crowe and his defense counsel, Lujan, caused several last-minute delays. Three such instances are particularly significant.

a.   *Crowe's Motion To Disqualify The Prosecution Team*

At trial, the government planned to offer testimony from Jose Eduardo Marinho Goncalves, a citizen and resident of Spain who had previously worked as a helicopter pilot for Hansen.  *See* 1-SER-6-9, 71-76.  Because the government could not compel Marinho to travel to the United States for trial, in the summer of 2020, the district court had authorized—and the government had taken—the deposition of Marinho for possible use at trial.  1-SER-71-76; *see* Fed. R. Crim. P. 15.[5]

In mid-February 2022, Marinho indicated to the government that he was willing to travel to Guam to testify live at trial.  *See* 1-SER-8-9, 12-13.  In the ensuing days, however, he wavered.  On February 20, 2022, he emailed the prosecutor, "I will not be able to go to Guam!  An American friend called me last Friday and told me that Rufus [Crowe] is sick, he hasn't slept for several days and that he love[s] me.  I don't want to continue suffering anymore!"  1-SER-16 (2/20/2022 email from Marinho

---

[5]   In July 2020, Marinho was arrested in Hawaii pursuant to a material witness warrant, 18 U.S.C. 3144.  *See* Dkt. No. 624 at 2, 8. Marinho was then transferred to the Territory of Guam, where the district court granted the government's motion to take his deposition pursuant to Rule 15.  *Ibid.*

to prosecutor). Within days, Marinho again changed his mind, informing the government that he was willing to travel for trial. *See* 1-SER-17-19. And, on February 25, 2022, Marinho explained in an email to the prosecutors that another former Hansen pilot had told him that, according to "Rufus [Crowe]," if Marinho cast doubt on his Rule 15 deposition, the prosecutor "will get in trouble, it will delay[,] and everything may even prescribe [sic]." 1-SER-20. The government promptly informed the district court of the potential witness tampering in a sealed, *ex parte* filing. 1-SER-53.

After learning of the government's filing,[6] on March 6, 2022, Crowe filed a motion seeking removal of the prosecution team, asserting that the government's filing evidenced improper animus against Crowe's attorney (Lujan). *See* 1-SER-25-38. In a related filing, Crowe stated that he had "c[o]me in possession of a video on which Marinho is addressing the camera and *states that the prosecution team has pressured him into giving false testimony.*" 1-SER-42 (emphasis added). Crowe did not explain how or when he had "c[o]me in possession" of the video. And in

---

[6] The government inadvertently served the filing on the defendants. *See* Dkt. No. 1369.

an email to the prosecutor, Marinho squarely rejected Crowe's characterization of the video:

> At first I was scared and I sent a video to Rufus, *but I have never said that the Government forced me to lie, because I have always told the truth in my deposition*, the only thing was the way I was held, but seeing the American laws a foreign citizen can be retained to clarify a crime.

1-SER-23 (3/7/22 email from Marinho to prosecutor) (emphasis added).

On March 8, 2022, the day trial was supposed to start, the district court held a hearing on Crowe's motion to disqualify. *See* 2-SER-97 (transcript). At the hearing, Crowe's attorney admitted that he had never watched the Marinho video on which Crowe's motion was largely based. *See* 2-SER-113-114 ("COURT: Let's listen to the tape first and then we could get into whatever else you want. … LUJAN: I believe this is it. I don't know. I've never seen it. Never watched it."). Three days later, at an evidentiary hearing on the same motion, Marinho appeared by videoconference and again denied any improper conduct by the federal prosecutors. *See* 2-SER-208 ("LUJAN: And in that video, you told Mr. Crowe that you want to return to Guam so you can inform the judge and

the jury that you were -- that your testimony was false? ... MARINHO: No, negative.").[7]

On March 11, the court rejected Crowe's disqualification claims as meritless, finding "no basis to remove the counsels for the Government, and no basis for the other forms of relief sought by" Crowe. 1-SER-4. In its written order, the court criticized Crowe's attorney for his unprofessional personal attacks on the prosecutor. *Ibid*.[8] While Crowe's motion proved meritless, it resulted in a substantial delay of the trial, which had been scheduled to start on March 8, 2022. And Crowe would have delayed the trial even longer had the court granted his request that

---

[7]     At the hearing, Marinho also explained that his characterization of the government as "dirty" in the video he made for Crowe merely reflected his frustration with being detained under a material witness warrant in 2020.    2-SER-218-219.    Marinho also attributed his frustration to the fact that his attorney in connection with his detention on a material witness warrant (who happened to be Lujan's niece, 2-SER-178-180) had not adequately explained the material witness process to him. 2-SER-218-221.

[8]     The district court also admonished Crowe's attorney for his unprofessional conduct during the court proceedings.  *See* 2-SER-225 ("COURT: The Court has already admonished you [Mr. Lujan] not to call Ms. Marie Miller a liar.  Okay.  That is contemptuous, I believe that's insulting, and that's not dignified in my courtroom.").

"[m]embers of the prosecution team … be examined under oath with independent counsel present." Dkt. No. 1389 at 3; *see also* Dkt. No. 1393.

### b. *Lujan's First Asserted Illness*

Later in the day on March 11, after it had become apparent that Crowe's disqualification efforts would fail (2-SER-230-267), Crowe's attorney, Lujan, did not appear back in court for the afternoon session. 2-SER-268. He instead relayed, through another defendant's counsel, that he was suffering from a sudden illness and "out of an abundance of caution, he scheduled an appointment to be tested" for COVID. *Ibid.*

The government suggested that Crowe be severed from the trial. 2-SER-269. The court then called Lujan on his cell phone and informed him, on the record, that it was considering a severance. 2-SER-272-283. Faced with the court's resolve to "figure out this issue today" (2-SER-282), Lujan recovered and was back to court with a negative COVID test later that afternoon (2-SER-283-284). Still, Lujan requested a further continuance until the following morning, claiming he was "super tired." 2-SER-282-290.

### c. *Lujan's Second Asserted Illness*

On March 14, 2002, a jury was finally empaneled and sworn in. Dkt. No. 1399. The parties gave opening statements the following day

(Dkt. No. 1401), and the government then called its first witness (Dkt. Nos. 1401-1402). When the parties and jurors arrived in court on March 17, with the government's first witness still on the stand, Lujan was again missing, assertedly because he was again experiencing COVID-like symptoms. 2-SER-295-296, 301-304, 310, 314. While Lujan's COVID tests during this period were consistently negative (Dkt. No. 1404), his asserted illness resulted in two more days of trial delay. *See* Dkt. No. 1403-1404 (minute entries for March 17 and 18).

### 3. Lujan's Purported "Ethical" Issue And Refusal To Continue Without A Mid-trial Continuance

On March 19, 2022 (a Saturday), Kandit News Group, a local "sensationalized" news group (3-ER-297), contacted the FBI to report that it had been contacted by an individual who claimed, via Facebook messaging, that there had been "jury … impropriety" in the Hansen trial. 1-ER-31; 3-ER-293. The Facebook message stated that "[a] few jurors who made it in the last six poll [sic] … just don't like Mr. Lujan." *Ibid.* The message also stated that "[o]ne juror didn't know of Mr. Lujan"[9] and "[s]he, along with others' eyes, nearly popped out when Mr. Lujan ripped

---

[9] Crowe observes (Br. 4) that Lujan is "well-known to local news groups in Guam."

the indictment" in the presence of the jury. 3-ER-294. The message further stated that "Mr. Lujan, his defendant and the other defense team will not have a fair and impartial trial" and that some of the jurors had talked about the case and already "formed their opinions and verdict," contrary to the district court's orders. 3-ER-293-294. When the FBI attempted to contact the sender of the Facebook message, the sender's Facebook page was gone. 3-ER-293.

The following Monday, March 21, 2022, the district court held an *in camera* hearing, at which the government relayed the information it had learned. 3-ER-292-294. The court agreed with the government that the post's timing and content cast doubt on the allegations' reliability, and that the news group involved—Kandit, whose owner was represented by Lujan "[i]n several matters" (3-ER-302)—was not a credible source. 3-ER-297-299. The government and one of Crowe's codefendants (Walker) maintained that delaying the trial was unwarranted and that any issues that might arise could be addressed as trial progressed. 3-ER-299, 310-311. The other individual defendant (Kapp) and the corporate defendant (Hansen) took no position. 3-ER-312. Only Lujan, on Crowe's behalf, asked the court to "hold the trial and look into this more" (3-ER-301),

stating that Lujan "represent[ed] Troy" Torres, the owner of the Kandit News Group, "[i]n several matters." 3-ER-297, 302.

The court rejected Crowe's request to delay the trial, finding that the Facebook message did not appear credible. 3-ER-306-308 ("I am not going to [delay the trial]. Based on just what I've heard, I don't think we should delay it. … [R]ight now, this could be a made up name. … I think it's just suspicious. I mean, it could be somebody trying to spook the trial."). At the same time, the court reassured the parties that it would address the issue further if additional information suggested a reason for concern. *See* 3-ER-307 (COURT: "[I]f things develop like during the course of the trial, we'll take care of it then."), 3-ER-310-312. The court then granted Lujan's request to confer with his client, ordering a 20-minute recess. 3-ER-313.

The proceeding resumed approximately 20 minutes later in open court. 1-ER-5. Lujan again requested a continuance, which he initially described as "one[ ]day" but immediately recharacterized as "probably 1 or 2 days." 1-ER-9. Lujan asserted that he needed the continuance to "research [his] ethical duty … to [his] client"—seemingly, whether Lujan could represent Crowe in front of jurors who allegedly did not like him

15

(Lujan)—and to allow Crowe to obtain advice from a second attorney. 1-ER-8-9. The government objected to any delay, citing the "week's-long delay based on an alleged [Marinho] issue" that "ended up not being a witness issue at all" as well as the delays "caused by Mr. Lujan's health." 1-ER-10-11.

The court rejected Lujan's renewed request for a continuance. 1-ER-11-15. The court explained that "the United States attorney already started this case," "[t]he witnesses ha[d] [already] come in from off island," "there [was] already a lot of money invested in this case," and the trial had already "been delayed." 1-ER-15. The court also doubted that Crowe could obtain the advice of a second attorney "in 1 or 2 days" given the scarcity of available lawyers in Guam. *Ibid.* ("[T]here is not enough lawyers to go around because whatever reason[.] … [T]hat might take 1 or 2 weeks."). And the court expressed skepticism that Lujan's purported "ethics issue" had any merit in the first place. *See* 1-ER-12 ("On the issue of ethics, I'm not sure about that because … I'm not sure I see the ethics issues"), 1-ER-22 ("I don't think it takes a[] rocket scientist to advise Mr. Lujan on this issue, if he gets a lawyer that is competent.

… That's why even -- you know, 24 hours, I just don't think is necessary. And so that's why I'm not inclined to grant that long of a delay.").

Although the court declined to grant a continuance, it did not force Lujan and Crowe to participate in the resumed trial if they wanted to first pursue Lujan's purported ethics dilemma. 1-ER-12 ("So you can evaluate it. I'll let you do that. Mr. Crowe can get an attorney as well."). To that end, the court asked for the government's position on a potential severance. 1-ER-12-13. In response, the government suggested that "a mistrial as to Mr. Crowe"—rather than a severance—would be the appropriate course "because the jury's already been empaneled." 1-ER-13. The court deferred a final determination of the issue. *Ibid.* ("[W]e'll look at that, I want to be sure that's correct. You may be right. But it -- anyway, long story short though, he could be tried separately."). The court again recessed to give Crowe and Lujan the opportunity to discuss the options on the table: (i) proceeding with the trial without a continuance; or (ii) "having Mr. Crowe have his trial tried separately at a later time." 1-ER-15-16.

After conferring with Crowe, Lujan reiterated both his request for a continuance (1-ER-16-17) and his displeasure with a potential

17

severance.  1-ER-17 (criticizing a severance as "foolish").  But he also maintained that, if the court was not inclined to grant a continuance, then "a mistrial for the entire case should be declared by the Court," as opposed to a severance.  1-ER-18.  In response, the court explained that a severance was consistent with Federal Rule of Criminal Procedure 14, that "it's not a mistrial at all," and that the options available to Crowe did "not put[] pressure on Mr. Crowe."  1-ER-18-19.  The court further explained that it had a "continuing duty at all stages of trial" to grant a severance "when it appears that prejudice may result due to prior joinder," 1-ER-20, and that the continuance requested by Crowe would result in prejudice to the government, especially considering that the witness on the stand was "not in the very best of health" and "need[ed] to get to the finish line."  1-ER-22-23; *see also* 1-ER-23 (government describing scheduling issues with other witnesses).[10]  The court also explained that, under the ruling it was considering, Crowe "would be severed from this case and tried at a later time."  1-ER-21.

---

[10]  Counsel for another defendant (Walker) asked to delay trial until the next morning, as his client "truly d[i]dn't want a severance."  1-ER-22.

18

Neither Crowe nor Lujan took issue with the court's reference to retrial or raised a double jeopardy objection. Instead, Lujan reiterated that Crowe wanted a continuance and that he also did not want to "be severed." 1-ER-26. When the court reiterated that it was not inclined to grant the continuance (1-ER-28), Lujan informed the court that he was resigning:

> Well, my client does not want to be severed, so I'm going to have to resign, Your Honor. He does not want to be severed. I'm going to resign.

1-ER-28; *see also ibid.* ("THE COURT: But he's going to be severed if you resign because he won't have a lawyer. … [PROSECUTOR]: Exactly. MR. LUJAN: But, but, but you're going to sever it now against his advice to me. And *because I'm not going to proceed without protecting myself ... ")* (emphasis added).

Having informed the court that he was resigning, Lujan tried to blame the government, asserting that the government had learned of the Facebook message a day and a half earlier (the previous Saturday afternoon) and produced the message to the defense on Monday morning. 1-ER-30. The government explained that it had acted diligently, as it had immediately informed the court's staff by email and then disclosed

the content of the Facebook message to the defense as soon as appropriate considering the FBI's ongoing investigation. 1-ER-31. The court then ruled:

> The Court hereby severs Defendant Crowe from this trial, so that Mr. Crowe may ensure that he has proper Counsel to proceed in this matter, whether it's -- whoever it is, and the other defendants may have a speedy trial. So Mr. Crowe, you are hereby severed today from the trial.

1-ER-32.

Having severed Crowe from the trial, the court called a recess to allow the remaining defendants to assess next steps. 1-ER-32, 34. During the recess, the court also heard from the remaining defendants' counsel *in camera*. Dkt. No. 1878. When the parties reconvened in open court, the court ordered a recess until the following morning, explaining that "the complexion of the trial [had] change[d] a bit and so [did] the line-up and so forth." 1-ER-35.

The following morning, Walker, Kapp, and Hansen moved for a mistrial, citing the impact of Crowe's severance on their planned joint defense and division of responsibilities among defense counsel. 2-SER-320, 322. The court denied the motion. 2-SER-320. At the same time,

based on representations made *in camera* by the remaining defendants'
attorneys after Crowe's severance, the court found, over the government's
objection (2-SER-323-324), that a continuance was warranted "to allow
all Counsels to regroup and now pursue their joint defense in a different
way, now that part of their joint defense has gone when the Court severed
Mr. Crowe out of the case yesterday." 2-SER-322. The court also
underscored the exceptional circumstances caused by Crowe's counsel,
which had led to Crowe's severance:

> Let me just say that the Court respects the
> position of the United States Attorney's Office. It
> puts them in a difficult situation because they
> have been spending a lot of money, per day,
> through no fault of their own, the case has been
> continued for various reasons. Well, not
> continued, but the matters have been definitely
> delayed. … We are now in the third week and
> we're still with witness No. 1. And through no
> fault of either the defense attorneys *that are here*
> or the prosecution, the Court finds itself in a
> situation that to ensure that the interest of justice
> is pursued, both for the prosecution and the
> defense and protected, and that to the extent that
> speedy trial rights are protected as well, but also
> to ensure that … each of the remaining defendants
> are able to present their defense in a way that
> would ensure that their rights are protected, the
> Court feels that a continuance would be granted.

2-SER-324 (emphasis added). The court then continued the trial until May 9, 2022. 2-SER-328.

### 4. Crowe's Motion To Dismiss

In April 2022, Crowe moved to dismiss the indictment on double jeopardy grounds. *See* Dkt. No. 1485. He argued that the district court improperly applied a "severance analysis" when, instead, it should have "'applied the standard for mistrials," which generally requires either consent or a finding of "manifest necessity," and that the manifest necessity standard was not satisfied. *Id.* at 3, 5-7. The court denied Crowe's motion, reasoning that it had properly analyzed Crowe's severance during trial. 3-ER-282-285. The court reiterated its March 21 "findings of prejudice," which had "necessitate[ed] Defendant Crowe's severance," including the facts (i) that Lujan's search for an attorney was "not going to take 1 or 2 days, [but] might take 1 or 2 weeks"; (ii) that "there would be prejudice to the other three defendants and the government"; and (iii) that Crowe's severance was necessary to "ensure that [Crowe] had proper counsel to proceed in this matter." 3-ER-285.

## SUMMARY OF ARGUMENT

The district court correctly denied Crowe's motion to dismiss the indictment on double jeopardy grounds. This Court should affirm that

ruling for two independent reasons.

*First*, the Double Jeopardy Clause requires a showing of manifest necessity only when the defendant's trial is terminated without the defendant's consent. Here, Crowe consented to retrial before a different jury. When confronted with the prospect of a severance, Crowe told the court that, if he could not obtain the continuance he was seeking, then "a mistrial for the entire case should be declared by the Court." 1-ER-18. Crowe, in other words, affirmatively requested that, if the continuance was denied, he should be retried before a different jury. When that condition precedent came to pass (*i.e.*, when the court confirmed that it would not grant a continuance), Crowe's request for a trial before a different jury became operative. And, by its plain terms, that request extinguished the sole double jeopardy interest at play in this posture: the right to proceed to verdict in front of the first jury empaneled. Crowe's remaining preference—*i.e.*, that he wanted to be tried before a new jury *with his codefendants*—has no connection, in law or logic, to his relevant double jeopardy interest of having his guilt decided by the first empaneled jury.

*Second*, even assuming that a manifest necessity requirement

applied, that standard is satisfied here. "[I]n the double jeopardy context[,] it is the substance of the action that is controlling, and not the label given that action." *United States v. DiFrancesco*, 449 U.S. 117, 142 (1980). Here, the trial record and the district court's findings make clear that the court's severance order was the functional equivalent of a declaration of a mistrial as to Crowe, and that there was manifest necessity to remove Crowe from his codefendants' joint trial. Indeed, the district court's conclusion that its "findings of prejudice *necessitat[ed]* Defendant Crowe's severance" makes a finding of manifest necessity inescapable. 3-ER-285 (emphasis added).

The record amply confirms that there was no viable alternative to severing Crowe from the trial. After weeks of delays caused largely by Crowe and his counsel, Crowe and Lujan seized on an anonymous report of juror misconduct—a report that neither the district court, nor the government, nor the other defendants deemed credible or worthy of a delay—to present the district court with an ultimatum: *Either* grant another continuance based on a purported "ethics issue" that the court deemed meritless; *or* "I'm not going to proceed" and "I'm going to resign," leaving Crowe without legal representation and forcing a certain

mistrial.

Faced with these options, the district court properly declined to be coerced into yet more unnecessary delay. At that point, Lujan's own ultimatum made Crowe's severance a manifest necessity, as a severance was the only way to "ensure that [Crowe] had proper counsel to proceed in this matter." 3-ER-285. Nothing about the district court's use of the "severance" label—as opposed to "mistrial" and "manifest necessity"—can displace the record's plain upshot. *See Arizona v. Washington*, 434 U.S. 497, 516-517 (1978).

None of Crowe's contrary arguments has merit. Crowe's reliance on the invited error doctrine (Br. 21) is misplaced. That doctrine limits the appellate courts' discretion to "*correct*[] invited errors" except "in extraordinary circumstances." *United States v. Perez*, 116 F.3d 840, 844 (9th Cir. 1997) (en banc) (emphasis added). Here, the government is not seeking to "correct" any alleged error—Crowe, the appellant, is. And it is well settled that this Court may affirm a district court's ruling on any ground supported by the record. *See, e.g.*, *United States v. Cortez-Arias*, 403 F.3d 1111, 1114 n.7 (9th Cir. 2005). Moreover, Crowe's attempts to relitigate the district court's underlying factual findings of prejudice do

not remotely show that those determinations were clearly erroneous.

Finally, Crowe repeatedly points (Br. 25, 26, 27) to the fact that, after Crowe's severance, the court granted a continuance until the following day and then a longer continuance until early May 2022. But Crowe omits that these later continuances were based on facts about the defendants' joint defense plan that transpired *after* Crowe had been severed. The fact that, in the court's view, issues that developed after Crowe's severance outweighed the risk of prejudice to the government, witnesses, and jurors—and thus warranted a continuance—does not mean that Lujan's purported "ethics dilemma" did.

## ARGUMENT

## THE DISTRICT COURT'S DENIAL OF CROWE'S MOTION TO DISMISS ON DOUBLE JEOPARDY GROUNDS SHOULD BE AFFIRMED

Crowe contends (Br. 12-30) that the district court erred in denying his motion to dismiss the indictment on double jeopardy grounds. He is incorrect for two independent reasons. First, Crowe consented to being severed and to proceeding to trial before a jury other than the one initially empaneled. And second, and in any event, the district court's decision to sever Crowe was supported by a manifest necessity.

26

## A.     Standard Of Review

This Court reviews de novo a district court's denial of a motion to dismiss the indictment on double jeopardy grounds. *See United States v. Bates*, 917 F.2d 388, 392 (9th Cir. 1990).  A judicial determination of "manifest necessity," when one is required, is reviewed for "abuse of discretion, but the level of deference varies according to the circumstances in each case." *United States v. Chapman*, 524 F.3d 1073, 1082 (9th Cir. 2008); *see infra* pp. 38-40.  Underlying factual findings are reviewed for clear error.  *United States v. Bonas*, 344 F.3d 945, 948 n.3 (9th Cir. 2003).

## B.     The District Court's Ruling Should Be Affirmed

### 1.     <u>Legal Principles</u>

a.     The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  The purpose of double jeopardy, "however, does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment." *Wade v. Hunter*, 336 U.S. 684, 688 (1949).  Such an inflexible rule "would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of

27

oppressive practices at which the double-jeopardy prohibition is aimed." *Id.* at 688-698. Thus, while criminal defendants generally "'have a right to have the jury first impaneled to try them reach a verdict,'" *Bates*, 917 F.2d at 392, that right "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments," *Wade*, 336 U.S. at 689.

Consistent with these principles, when, as in this case, a defendant's trial is terminated "after jeopardy attaches but before the jury reaches a verdict," the defendant may be retried for the same crime before a different jury under two circumstances: (1) if he "consents" to the termination; or (2) if the termination was "required by 'manifest necessity.'" *Bonas*, 344 F.3d at 948. In ascertaining manifest necessity, courts have "steadfastly … refuse[d] to categorize fact patterns that constitute manifest necessity and fact patterns that do not." *Bates*, 917 F.2d at 394 (citing *United States v. Jorn*, 400 U.S. 470, 480 (1971) (plurality opinion)). Moreover, "the key word 'necessity' cannot be interpreted literally; instead, ... there are degrees of necessity and [the courts] require a 'high degree' before concluding that a mistrial is appropriate." *Arizona v. Washington*, 434 U.S. 497, 506 (1978).

28

2.   By Requesting A "Mistrial For The Entire Case" Absent A Continuance, Crowe Consented To Retrial Before A Different Jury

As Crowe acknowledges (Br. 17), when a criminal defendant expressly or implicitly consents to the termination of his trial, the Double Jeopardy Clause generally does not bar retrial.   *See*, *e.g.*, *Chapman*, 524 F.3d at 1081; *United States v. Smith*, 621 F.2d 350, 351 (9th Cir. 1980) ("An implied consent to a mistrial, like an express consent, removes any double jeopardy bar to retrial.").   But Crowe then asserts, without explanation, that "Mr. Crowe did not consent."   Br. 17.   That factual premise, which is critical to Crowe's claim on appeal, is incorrect.   As explained below, Crowe, through Lujan, validly consented to retrial before a second jury when he requested "a mistrial for the entire case" if a continuance was denied.   1-ER-18.[11]

---

[11]   The district court did not rely on Crowe's consent to retrial in rejecting his double jeopardy claim, but this Court "may of course affirm on any ground supported by the record even if it differs from the rationale of the district court.'"   *United States v. Cortez-Arias*, 403 F.3d 1111, 1114 n.7 (9th Cir.), *amended by* 415 F.3d 977, *and amended by* 425 F.3d 547 (2005) (internal quotation marks omitted).

29

After the district court denied Crowe's request for a continuance (1-ER-7),[12] the court inquired whether Crowe objected to a potential "mistrial or having Mr. Crowe have his trial tried separately at a later time." 1-ER-15. In response, Crowe reiterated his preference for a continuance and objected to holding separate trials for different defendants as "foolish" and "a waste of a lot of people's time and money." 1-ER-17. But Crowe also made clear that his position with respect to a "sever[ance]" was distinct from his position with respect to a potential mistrial. As to the latter, Crowe maintained that, if he was otherwise required to proceed with the trial without a continuance, "a mistrial for the entire case should be declared by the Court." 1-ER-18. Crowe, in other words, expressly told the court that, as between being tried before the empaneled jury (without a continuance) or a new jury after resolving Lujan's purported ethical issue, he preferred the latter.

Crowe's request for "a mistrial for the entire case" extinguished his double jeopardy interests. As Supreme Court precedent makes clear, the

---

[12]    *See* 1-ER-7 ("the Court has decided based on the objection, at least by one Counsel, to … proceed without further delay … on the examination of witness number one").

Double Jeopardy Clause is implicated in the context of mistrials only because the Clause protects the "valued right to have his trial completed by a particular tribunal." *Wade*, 336 U.S. at 689; *see also Crist v. Bretz*, 437 U.S. 28, 40-47 (1978) (Powell, J., dissenting) (tracing historical development of double jeopardy and mistrials). But where, as here, the defendant expresses a preference for having his guilt determined by a second jury rather than facing the only alternative available to him as of right—*i.e.*, proceeding with the ongoing trial before the first jury—his choice disposes of the "valued right" protected by the Clause.

This case is illustrative: at least until his attorney abandoned him (*see infra*), Crowe consistently retained the option of having his case decided by the empaneled jury. And while Crowe was ultimately ordered to face trial before a different jury, that order, too, was consistent with Crowe's own preference (1-ER-18) for having his guilt determined by a second jury rather than exercising his right to have his case decided by the first empaneled jury without a continuance. At all relevant times, in other words, as far as selecting which jury would decide his guilt, Crowe retained "primary control over the course to be followed." *United States v. Scott*, 437 U.S. 82, 93-94 (1978) (internal quotation marks omitted).

31

To be sure, Crowe did not get everything he asked for after the court denied the continuance. Crowe asked for a mistrial "for the entire case"—*i.e.*, to be retried *with his codefendants*. The district court, instead, ordered that only Crowe be retried, as the other defendants were not affected by Lujan's purported ethics issue and did not request a mistrial. But that feature of Crowe's second trial—much like, say, the possibility of intervening guilty pleas by Crowe's codefendants—bears no logical connection to the only interest protected by the Double Jeopardy Clause in this context: the defendant's right to "'have the jury first impaneled to try them reach a verdict.'" *Chapman*, 524 F.3d at 1081; *see also ibid.* (explaining that the right is designed to protect against the added "emotional and financial burden" of a new trial and the "unfair[ness]" that the prosecution may "tailor its case based on what it learned the first time around").

Contrary to Crowe's assertions (Br. 18), the First Circuit's decision in *United States v. Newton*, 327 F.3d 17 (1st Cir. 2003), confirms that Crowe surrendered any double jeopardy bar to retrial when he requested a "mistrial for the entire case." 1-ER-18. In *Newton*, the district court determined that, despite some conflict between Newton's defense and one

32

of his codefendants', there was no manifest necessity for a mistrial. 327 F.3d at 22-24. At the same time, the court indicated that, if Newton and all his non-antagonistic codefendants requested a severance and mistrial, the court was willing to grant their request. *Id.* at 24. Newton's non-antagonistic codefendants so requested. *Ibid.* For Newton, therefore, the choice boiled down to *either* "be[ing] tried before the empaneled jury" with his existing codefendants (including the antagonistic one); *or* "join[ing] the[] [two non-antagonistic codefendants] in their requests for a mistrial and hence waiv[ing] any claim that double jeopardy bars retrial." *Ibid.* Newton "'reluctantly'" chose the latter, and the district court later denied Newton's double jeopardy claim. *Ibid.*

On appeal from his retrial and conviction, the First Circuit rejected Newton's claim that his consent to retrial was invalid because the trial judge "intentionally provoked his mistrial request" when he offered him a choice between (i) continuing with a trial that Newton deemed imperfect before the empaneled jury; and (ii) requesting a mistrial that would waive any double jeopardy claim. 327 F.3d at 25. The First Circuit held that "the mere fact that Newton was offered a choice of two imperfect options does not imply compulsion." *Ibid.* The court found dispositive

that "the opportunity for Newton to proceed with the empaneled jury remained," and "there is no indication that, of the two options available to Newton, the judge preferred a mistrial for which he saw no manifest necessity." *Ibid.*

So, too, here. At least until Lujan resigned, Crowe retained the option of proceeding before the empaneled jury. Faced with that option, Crowe expressly requested a mistrial and, in so doing, consented to a retrial before a different jury. The fact that Crowe would have preferred that his codefendants also be tried before a different jury is beside the point. As in *Newton*, the fact that Crowe "was offered a choice of two imperfect options does not imply compulsion." 327 F.3d at 25.

None of Crowe's arguments cast doubt on this analysis. Aside for *Newton*, Crowe cites (Br. 13-20) cases supporting the notion that, *absent consent by the defendant*, retrial after a mid-trial severance is permissible only if there was manifest necessity for the severance. But those decisions have no bearing on the antecedent question presented here: whether Crowe's express request for a "mistrial for the entire case" (1-ER-18) after he did not receive a continuance constituted valid consent to be retried by a second jury.

34

Separately, Crowe suggests (Br. 29) that reversal would be required even if the Double Jeopardy Clause is not implicated because, in his view, the district court also misapplied the severance standards under Federal Rule of Criminal Procedure 14. That contention fails for two reasons. First, Rule 14 standards come into play here only if double jeopardy is not implicated. If double jeopardy is not implicated, however, neither is the right not to be retried—the sole basis for interlocutory review under the collateral-order doctrine in this case. *See Abney v. United States*, 431 U.S. 651, 659-660 (1977). Nor does Crowe provide any other reason why an order granting severance under Rule 14 should be deemed "effectively unreviewable" after a final judgment, as required under the collateral-order doctrine. *E.g.*, *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 800 (1989) (internal quotation marks omitted) (denial of motion to dismiss based on violation of grand jury secrecy is not immediately appealable, because it can be remedied on appeal from final judgment).[13]

---

[13]     *See also United States v. Hollywood Motor Car Co., Inc.*, 458 U.S. 263, 270 (1982) (per curiam) (same for motion to dismiss based on prosecutorial vindictiveness); *United States v. Taylor*, 881 F.2d 840, 842 (9th Cir. 1989) (same for motion to dismiss based on prosecutorial misconduct before a grand jury); *United States v. Layton*, 645 F.2d 681, 683 (9th Cir. 1981) (rejection of jurisdictional argument).

This Court, therefore, lacks appellate jurisdiction to consider Crowe's Rule 14 claim.

Second, Crowe's Rule 14 claim would fail even if this Court could consider it at this stage. As explained below, Lujan's refusal to stay on as Crowe's counsel absent a continuance made a mistrial as to Crowe a manifest necessity. Because the order severing Crowe satisfied the manifest necessity standard, it necessarily satisfied Rule 14's comparable "prejudice" standard. *See* Fed. R. Crim. P. 14. If this Court finds it necessary to reach the merits of Crowe's Rule 14 claim, it should reject it for the same reasons discussed below.

> 3. <u>In The Alternative, The District Court's Severance Order Was Supported By Manifest Necessity</u>

> a. *The Manifest Necessity Inquiry*

As noted above, when a district court terminates a criminal defendant's trial because of a "manifest necessity," double jeopardy generally does not bar retrial. *Washington*, 434 U.S. at 505-506. Further, while deadlocked juries are the paradigmatic example of manifest necessity, the manifest necessity inquiry is open-ended and case-specific, and courts have refused to create a taxonomy of situations

that qualify and situations that do not. *See Bates*, 917 F.2d at 394; *Jorn*, 400 U.S. at 480 (plurality opinion).

In the manifest necessity context, as elsewhere "in the double jeopardy context[,] it is the substance of the action that is controlling, and not the label given that action." *United States v. DiFrancesco*, 449 U.S. 117, 142 (1980). Accordingly, "'the district court [is] not required to make an explicit finding of manifest necessity or to articulate on the record all the factors which informed its discretion.'" *Chapman*, 524 F.3d at 1081 (quoting *Smith*, 621 F.2d at 351); *see also Washington*, 434 U.S. at 516-517. The Supreme Court's decision in *Washington* is instructive. There, the state "trial judge did not expressly find that there was 'manifest necessity' for a mistrial; nor did he expressly state that he had considered alternative solutions and concluded that none would be adequate." 434 U.S. at 501. After the defendant was retried and convicted, on habeas review, the district court and this Court both sustained the defendant's double jeopardy challenge, relying on the absence of an express finding of manifest necessity by the state trial court. The Supreme Court reversed, finding it sufficient that "[t]he basis for the trial judge's mistrial order [was] adequately disclosed by the record, which includes the

37

extensive argument of counsel prior to the judge's ruling." *Id.* at 517 (noting that the district court was best positioned to assess the impact of the error on the jury). This Court has since applied the same principles and reasoning with equal force on direct appeal in *Chapman*, 524 F.3d at 1082-1083.

As Crowe acknowledges (Br. 23-25), district court rulings bearing on manifest necessity are reviewed for abuse of discretion, and the deference accorded to the trial court's ruling varies "according to the circumstances in each case." *Chapman*, 524 F.3d at 1082. When "the prosecution [seeks] the mistrial for tactical advantage, a judicial determination of 'manifest necessity' is reviewed with 'the strictest scrutiny.'" *Ibid.* (quoting *Washington*, 434 U.S. at 508). "In contrast," when the judge's determination "is based on his or her own observations and personal assessment that a fair trial would be impossible, that view must be given special deference." *Ibid.* (citing *Washington*, 434 U.S. at 510-511). As *Washington* itself exemplifies, "special respect" for a judge's determinations bearing on manifest necessity can be appropriate even when, as in *Washington*, the trial court neither "expressly find[s] that there was 'manifest necessity' for a mistrial" nor "expressly state[s] that

he had considered alternative solutions." 434 U.S. at 501, 510. What matters is that the record as a whole makes the basis for the district court's reasoning clear. *Id.* at 517.

Under this "deferential" standard of review, this Court "must ensure that the lower court exercised 'sound discretion.'" *Chapman*, 524 F.3d at 1082. Affirmance is therefore appropriate "even if other reasonable trial judges might have proceeded with the trial despite" the problem. *Ibid.* The objective is to "weed out 'irrational or irresponsible behavior by the trial judge,'" *ibid.* (quoting *Bates*, 917 F.2d at 395), "focus[ing] on the procedures employed by the judge in reaching his determination," *ibid.* To that end, this Court has identified three guiding considerations: "whether the district court '(1) heard the opinions of the parties about the propriety of the mistrial, (2) considered the alternatives to a mistrial and chose[] the alternative least harmful to a defendant's rights, [and/or] (3) acted deliberately instead of abruptly.'" *Ibid.* (quoting *Bates*, 917 F.3d at 396). This Court has also considered "whether the judge 'properly determined that the defendant would benefit from the declaration of mistrial,'" though the continued validity of this last factor has been questioned. *See id.* at 1082 n.3 (comparing *Gori v. United*

39

*States*, 367 U.S. 364, 369 (1961), *with Illinois v. Somerville*, 410 U.S. 458, 471 (1973), and *Jorn*, 400 U.S. at 483 (plurality opinion)).

> b.  *The District Court's Determination That The Circumstances "Necessitat[ed]" Crowe's Severance Is Entitled To Substantial Deference*

Here, as in *Washington* and *Chapman*, the district court did not "make an explicit finding of 'manifest necessity,' but [the court] made clear that [it] believed the trial could not continue" with Crowe. *Chapman*, 524 F.3d at 1082; *Washington*, 434 U.S. at 510-511. The district court held two hearings—one *in camera* and one in open court—at which it heard from all parties and carefully considered the prejudice that would result from the options available. 1-ER-2-43; 3-ER-286-319. At those hearings, the district court made pointed findings (*see supra* pp. 15-20, 22; *infra* pp. 42-49) and ultimately determined that the circumstances "necessitat[ed] Defendant's Crowe's severance." 3-ER-285. While those factual findings and conclusions were reached under the rubric of severance, they necessarily imply that severing Crowe was a manifest necessity. This Court should therefore review the district court's finding that Crowe's severance was necessary deferentially,

"asking whether it was 'one that a rational jurist could have made based on the record presented to him.'" *Chapman*, 524 F.3d at 1083.

Crowe's contrary arguments lack merit. Crows says (Br. 24) that "no deference at all is appropriate given the lack of a manifest-necessity finding." That assertion, however, ignores the Supreme Court's decision in *Washington*. In *Washington*, too, the trial court made no explicit finding of manifest necessity—indeed, in *Washington*, unlike here, the district court never "expressly state[d] that he had considered alternative solutions," 434 U.S. at 501. Yet, in *Washington*, the Supreme Court concluded that "special respect" for the trial judge court's determination was warranted, *id.* at 510-511, noting that the record as a whole made the basis for the trial court's reasoning clear, *id.* at 517. A fortiori, the same degree of deference is appropriate here, where the district court expressly found that the circumstances "necessitat[ed]" Crowe's severance. 3-ER-285.

In a footnote, Crowe suggests that "strictest scrutiny"—the standard appropriate when "the prosecution sought the mistrial for tactical advantage," *Chapman*, 524 F.3d at 1082—should apply because the prosecutor "encouraged" Crowe's severance and "there is certainly an

41

inference" that the government did so to "remove Mr. Lujan," who is well known in Guam. Crowe's speculation merely reprises the same type of groundless accusations of prosecutorial animus that the district court squarely rejected in the proceedings below. *See supra* pp. 11-12 & n.8. Regardless, the government neither caused Lujan's purported ethical dilemma nor forced him to abandon his client. And it was the court, not the prosecution, that first raised the possibility of severing Crowe at the March 21 hearing. 1-ER-11-12.

### c. Under Any Degree of Deference, There Was Manifest Necessity For Crowe's Severance

Under any level of deference, the factors set forth in *Bates*, *Chapman*, and like cases establish that there was manifest necessity for Crowe's severance.

i. *Hearing from the parties.* The Supreme Court and this Court have both found that "trial courts are much more likely to have exercised sound discretion when they listen to the parties before declaring a mistrial and dismissing the jury." *Bates*, 917 F.2d at 396 (citing cases); *see also Washington*, 434 U.S. at 515-516 (declining to find abuse of discretion where the trial judge "gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of

42

a mistrial"). Here, as noted, the district court held two hearings—one *in camera* and one in open court—at which it heard from all parties and carefully considered the prejudice that would result from the options available. 1-ER-2-43; 3-ER-286-319. The court also repeatedly allowed Crowe to consult in private with his lawyer to chart Crowe's preferred way forward. 1-ER-7-8, 16; 3-ER-313. The process accorded to Crowe, therefore, bore no resemblance to the situation this Court found problematic in *Bates*, where "the court did not let the parties comment, despite their requests." 917 F.2d at 397. In fact, the process here vastly exceeded the procedures cited with approval in *Washington* and *Bates*.

ii. *Considering the alternatives and choosing appropriate remedies*. As this Court has explained, "[a] trial court should consider and correctly evaluate the alternatives to a mistrial." *E.g.*, *Bates*, 917 F.2d at 396. In *Jorn*, for example, "the trial court's failure to consider the possibility of a trial continuance was a factor that influenced the Supreme Court's finding that the court had abused its discretion." *Ibid.* (citing *Jorn*, 400 U.S. at 487); *see also Smith*, 621 F.2d at 351 ("The record gives no indication that the court here even considered the possibility of a continuance before ordering a mistrial."). In contrast, in upholding a

43

finding of manifest necessity in *United States v. Shaw*, 829 F.2d 714 (9th Cir. 1987), this Court commended the trial court for "consider[ing] both curative jury instructions and the introduction of [relevant] grand jury testimony as alternatives to a mistrial." *Id.* at 720.

Here, the district court carefully considered the alternatives proposed by Crowe and the other parties. Most importantly for present purposes, the court repeatedly engaged with the parties about Lujan's purported ethics concern (*see* 1-ER-7-8, 12-13, 22; 3-ER-301-305), about the substance and credibility of the alleged jury misconduct (*see* 3-ER-304-305, 307), about Crowe's repeated requests for a continuance (*see* 1-ER-7-8, 9-11, 13-14, 21-23, 24-25, 28-32; 3-ER-306-308, 312-313), and about the need to sever Crowe if Lujan insisted on not proceeding without a continuance (*see* 1-ER-12-15, 28-30). The court also considered—and welcomed—another defendant's suggestion to "go ahead and go forward" with the trial and take up the issue during breaks if needed (3-ER-310-312), as well as a suggestion that Lujan and Crowe could seek advice during a court break that day (1-ER-24-26).

Substantively, moreover, the record amply established that severing Crowe was the least harmful remedy. To begin with, the court

had ample grounds to deny a further continuance to accommodate Lujan's purported dilemma. As explained (*supra* pp. 7-13), and as the hearing transcript confirms (1-ER-10-11), Crowe and his attorney, Lujan, had already caused extensive delays in the previous weeks. Crowe had caused nearly a week-long delay "based on an alleged witness issue [Marinho] that ended up not being a witness issue at all." 1-ER-10; *supra* pp. 7-12. And Lujan had twice delayed the trial by failing to appear in court and calling in sick. 1-ER-11; *supra* pp. 12-13. Largely as a result of these delays, nearly two weeks after the trial's scheduled start date, the trial was "still on witness No. 1 out of 40." 3-ER-311.

A continuance, moreover, would have burdened the witnesses who were expected to testify. The witness on the stand was "not in the very best of health" and "need[ed] to get to the finish line." 1-ER-22-23. That witness' lawyer was scheduled to leave Guam for California "for ten days at the end of [that] week." 1-ER-23. Other witnesses had traveled from New Zealand and the Philippines and were waiting to testify. 1-ER-23, 29. In the government's estimate, it was costing the government alone "$130,000 a day for th[e] trial." 1-ER-29. *See also* 1-ER-15 ("COURT: … [T]he United States attorney already started this case, there is already a

lot of money invested in this case.  The witnesses have come in from off island.  It has been delayed.")

In rejecting a continuance as an alternative, the court also properly concluded that Lujan's proposal to delay the trial for one or two days would not serve any real purpose.  For one thing, the court, after being briefed about the matter, saw little merit in Lujan's ethics issue: "On the issue of ethics, I'm not sure about that because … I'm not sure I see the ethics issues."  1-ER-12; *see also* 1-ER-22 ("I don't think it takes a[] rocket scientist to advise Mr. Lujan on this issue, if he gets a lawyer that is competent.  I will tell you that now.").  Accordingly, the court concluded that "even … 24 hours" were not "necessary" and was "not inclined to grant that long of a delay."  1-ER-22.  For another, if Lujan really was going to obtain advice from another lawyer, finding a lawyer in Guam who was available and not conflicted was likely going to take more than the one or two days Lujan had requested.  *See* 1-ER-15 ("[T]here is not enough lawyers to go around because whatever reason … at least to represent you, or even to advise Mr. Crowe[.]  [T]hat's not going to take 1 or 2 days, that might take 1 or 2 weeks.  And I mean, maybe I'm exaggerating.").

46

Finally, but most importantly, a finding of manifest necessity was inevitable when Lujan announced, after the court refused to grant Lujan's request for yet another unnecessary delay, that he was "not going to proceed without protecting [him]self" and was "going to resign." 1-ER-28. At that point, severing Crowe became the *only* way to "ensure that he has proper Counsel to proceed in this matter." 1-ER-32.

    iii.    *Deliberate instead of abrupt action.* This Court's precedent also counsels that "[a] trial court's abrupt declaration of a mistrial suggests that it failed to exercise sound discretion." *Bates*, 917 F.2d at 396-397. *Compare Washington*, 434 U.S. at 515 (no abuse of discretion where the trial judge did not act "precipitately" in responding to the prosecutor's mistrial request), *with Jorn*, 400 U.S. at 487 (abuse found where the trial judge acted "abruptly," among other factors). Here, the district court gave extensive thought to the issue. It held a 35-minute hearing *in camera* to discuss the allegations in the Facebook message and Crowe's request for a continuance. 3-ER-289-319. It then held another hearing in open court, which lasted nearly one hour (with a break to allow Crowe to consult with Lujan). 1-ER-6-33. The court's careful process— and its resulting decision—was anything but "abrupt."

iv. *Benefit to the defendant.* The final factor, to the extent it applies, also supports the district court's severance order. As this Court has explained, the fact that a mistrial is "granted to benefit the defendant" generally weighs against barring retrial on the same charges. *Bates*, 917 F.2d at 397; *see also Gori*, 367 U.S. at 369 ("[W]e are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial"). Here, by the time the court issued its severance order (1-ER-18), two things had happened: (i) the district court had denied Crowe's request for a continuance (1-ER-7); and (ii) Crowe's attorney, Lujan, had made clear that, without a continuance, he was "not going to proceed" as defense counsel for Crowe and was therefore "going to resign" (1-ER-28). At that point, severing Crowe from the joint trial clearly worked to Crowe's benefit—indeed, it became a necessity to protect Crowe's Sixth Amendment right to counsel. Nor is that obvious benefit a matter of "post hoc … speculation." *Jorn*, 400 U.S. at 483. In announcing its severance decision, the district court expressly based its decision, in part, on the need to "ensure that [Crowe] has proper [c]ounsel to proceed in this matter." 1-ER-32. And the court reiterated the same point in denying

48

Crowe's motion to dismiss. 3-ER-285 (reaffirming that Crowe was severed "so that he could ensure that he had proper counsel to proceed in this matter").

\* \* \*

To the extent manifest necessity was required, the record and the court's factual findings necessarily established that severing Crowe was a manifest necessity. Under *Washington*, *Chapman*, and like cases, that disposes of Crowe's double jeopardy claim.

### d. Crowe's Remaining Arguments Lack Merit

i. Crowe raises (Br. 21-23) three procedural arguments, but none has merit.

First, Crowe invokes the invited error doctrine (Br. 21), asserting that the government "convinced the district court that it was simply entering a mid-trial 'severance' under Rule 14." *Ibid.* Even putting aside that it was the government that first raised the Double Jeopardy Clause's "mistrial" standard (1-ER-13), Crowe has the invited error doctrine backwards. That doctrine is designed to promote appellate restraint, not appellate intervention. It accordingly limits the appellate courts' error-correction function by directing them to "*correct*[] invited errors only in

extraordinary circumstances." *United States v. Perez*, 116 F.3d 840, 844 (9th Cir. 1997) (en banc) (emphasis added); *see also Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002) (under invited error, "one may not *complain* on review of errors below for which he is responsible") (emphasis added); *United States v. Schaff*, 948 F.2d 501, 506 (9th Cir. 1991) ("Under the invited-error doctrine, an error that is caused by the actions *of the complaining party* will cause *reversal* 'only in the most "exceptional situation."'") (emphases added). Here, the government is not seeking to "correct" any alleged error—Crowe, the appellant, is. When, as here, the appellee raises a waived or forfeited ground for affirmance, this Court "may affirm [the] district court's ruling on any ground supported by the record." *United States v. Cortez-Arias*, 403 F.3d 1111, 1114 n.7 (9th Cir. 2005). That settled principle should apply with special force where, as here, the appellee did reference a mistrial and double jeopardy when the issue of severance first surfaced (1-ER-13) and the equities weigh strongly against letting a defendant charged with serious offenses go free.

Crowe's related contention (Br. 22) that the government "waiv[ed]" the argument that manifest necessity was established by not arguing the

point "alternatively" in the district court is equally unavailing. For one thing, the omission of that alternative argument was, at most, a forfeiture, not a waiver. *See United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019) (en banc) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right" (internal quotation marks and emphasis omitted)). For another, as noted, this Court has discretion to affirm on any ground supported by the record, whether or not the issue was raised below or relied upon by the district court. *See Johnson v. Buckley*, 356 F.3d 1067, 1072 n.1 (9th Cir. 2004) ("[Appellant] suggests that the issue … was not preserved, but we may affirm on any ground supported by the record."). Here, as noted, the equities weigh strongly in favor of exercising that discretion.

Finally, Crowe contends (Br. 21) that, because the district court did not make a finding as to manifest necessity, "this Court cannot reconstruct such a finding now." But that contention contravenes the Supreme Court's holding in *Washington*—reaffirmed by this Court in *Chapman*—that an express finding of manifest necessity is *not* required. None of the decisions Crowe cites support his contrary assertion. For

starters, *United States v. Sanders*, 591 F.2d 1293 (9th Cir. 1979), undermines, rather than support, Crowe's position. Crowe cites (Br. 21) a passage in *Sanders* observing that "the record [did] not reveal a … concern on [the trial judge's] part for the double jeopardy consequences of an erroneous ruling." 591 F.2d at 1298. But, critically, the *Sanders* Court still went on to consider whether "the record … reveal[ed] the manifest necessity for a mistrial." *Ibid.* This Court should do the same here.

*United States v. Meza-Soria*, 935 F.2d 166 (9th Cir. 1991) (cited at Br. 22) is also inapposite. There, this Court considered whether double jeopardy bars retrial where (i) a trial court declares a mistrial over the defendant's objection in the good-faith belief that a fatal error just occurred in the trial; but (ii) it later turns out that the court's belief is incorrect and no error actually occurred. *Id.* at 171. This Court held that, if there was no error in the first place, then there was no manifest necessity for a mistrial. *Ibid.* *Meza-Soria*'s merits holding about *what* can constitute manifest necessity lends no support to Crowe's entirely distinguishable argument (Br. 21) that this Court should not consider the merits of manifest necessity in the first place—even where, as here, the

record and findings below established the manifest necessity for a mistrial.

Finally, Crowe (Br. 21) cites *Townsend v. Sain*, 372 U.S. 293, 315-316 & n.10 (1963), *overruled by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), a habeas case involving an allegedly involuntary confession. In relevant part, *Townsend* discussed which factual findings a habeas court may properly "reconstruct[]" based on a state court's ruling when "it is unclear … whether the state court found the law or the facts adversely to the petitioner's contentions." *Id.* at 315. This case, of course, does not turn on habeas rules. And the district court's underlying factual findings relevant to manifest necessity were express, not merely implicit in the court's Rule 14 ruling.

ii.    Crowe's merits arguments (Br. 23-30) are also unavailing. Crowe argues (Br. 25) that, if time was of the essence, the government should have made the Facebook message available to Crowe immediately on Saturday evening, as opposed to Monday morning. *Ibid.* But the government had good reason to wait, as disclosure could have jeopardized the FBI's ongoing investigation into the matter. 1-ER-31. Crowe now second-guesses that judgment (Br. 25), asserting that "the information

53

could have been disclosed to the attorneys under a protective order." *Ibid.* But that assertion obscures the fact—apparent on the face of the Facebook message (3-ER-294)—that Lujan had a preexisting relationship with the "sensationalized" news organization (3-ER-297-298) that provided the tip in the first place. *See also* 3-ER-296-297, 302-305 (discussing relationship). There was no guarantee that a protective order would have adequately protected the FBI's investigation.

Crowe also rehashes (Br. 26-27) his view that the court should have granted a continuance. In a similar vein, he second-guesses (Br. 28) the court's finding that that a continuance would have prejudiced the witness on the stand, that witness's attorney, and other witnesses who had traveled from overseas to testify at trial. But Crowe's quibbles—which largely ignore the evidence before the court (*see supra* pp. 15-18, 45-46)— do not come close to showing that the court's prejudice findings were clearly erroneous. Much less do they establish that the court was required to accept yet more delay to accommodate Lujan's latest whims.

Nor is Crowe's cause helped by the fact that other courts have, on different facts, reversed manifest necessity findings based in part on those trial courts' refusals to grant continuances. *See* Br. 26 (citing two

1978 decisions from another circuit). As this Court has explained, the manifest necessity inquiry is intensely case-specific and does not lend itself to the type of rough generalizations Crowe urges on appeal. *Bates*, 917 F.2d at 394. As explained above, the court had ample basis to conclude that a continuance would have been both unacceptably prejudicial and a waste of time.

Crowe next offers other alternatives that, in hindsight, he thinks the court should have considered. For example, he asserts (Br. 27) that the court "could have continued with the trial while informing Mr. Crowe that it would grant [a] request for a 'severance' within the next couple of days." Crowe, however, did not propose that option at trial. And that proposal would have run into a basic problem: after Lujan made clear that he was "not going to proceed" without a continuance and abandoned his client, Crowe's trial could *not* have gone forward.

Crowe's other suggestion on appeal—that the court could have "conducted an inquiry of the jurors" to determine whether the Facebook message was really "bogus" (Br. 27)—is also meritless. The district court was best positioned to assess the reliability of the third-hand allegations relayed to the FBI by a dubious news group (*see, e.g.*, 3-ER-296, 299)

linked to Crowe's attorney (3-ER-294, 302-305). Having concluded that "there is no actual evidence to suspect that there is something going on" (3-ER-299), the court was under no obligation to indulge Lujan in his latest plea for delay—especially considering that doing so could have distracted the jurors from their important task. *See also* 3-ER-299-300 ("I just think we should move on. I don't think we should bring it to the jurors' attention because it could be somebody just messing with the trial. … I don't want to go on every little ... ").

Crowe also (Br. 28) questions the district court's factual finding that severing Crowe was necessary to ensure that Crowe had proper counsel. In his view, "[i]t is not clear what the district court meant." *Ibid*. In fact, the meaning of the court's words is self-explanatory: because Lujan had refused to proceed without a continuance, the court needed to ensure that Crowe, a criminal defendant facing serious charges, was represented by counsel in the ongoing trial. The only way to do so was to sever him from the trial and have him tried separately.

Finally, Crowe repeatedly points (Br. 25, 26, 27) to the fact that, after Crowe's severance, the court granted a continuance until the following day and then a longer continuance until early May 2022. But

56

Crowe omits that that these later continuances were based on facts about the defendants' joint defense plan that transpired *after* Crowe had been severed. Those facts included information about the "division of responsibility" among the defendants' attorneys "relating to th[e] trial," which "completely changed" once Lujan withdrew and Crowe was severed. Dkt. No. 1878 at 6. The fact that, in the court's assessment, issues that developed after Crowe's severance outweighed the risk of prejudice to the government, witnesses, and jurors—and thus warranted a continuance—does not mean that Lujan's purported "ethics dilemma" did.

## C. In The Alternative, The Court Should Remand The Case And Instruct That The District Court Conduct A Manifest Necessity Analysis In The First Instance

For the reasons discussed above, the record and district court's findings amply establish that there was a manifest necessity for a mistrial. Consistent with *Washington*, *Chapman*, and like cases, moreover, there are sound grounds for this Court to deem a finding of manifest necessity implicit in the district court's rulings, defer to that determination, and affirm on that basis. But even if this Court were not inclined to affirm outright, reversal would still be unwarranted. Instead,

the proper course would be to remand the case to the district court with instructions to conduct a manifest necessity analysis in the first place. Other courts have issued remand orders for district courts to determine manifest necessity in the first instance. *See, e.g.*, *United States v. Muhammad*, 498 Fed. Appx 251, 252 (4th Cir. 2012) (per curiam) (unpublished) (remanding for manifest necessity analysis "[i]n light of the parties' changed positions concerning *Bruton*"); *United States v. Allick*, 274 Fed. Appx 128, 137 (3d Cir. 2008) (unpublished) (remanding for determination of manifest necessity in case involving a mistrial based on a deadlocked jury). If the Court is not inclined to affirm on the existing record, the same approach is warranted here.

## CONCLUSION

The district court's order denying Crowe's motion to dismiss the indictment on double jeopardy grounds should be affirmed.

Respectfully submitted,

SHAWN N. ANDERSON
United States Attorney

KENNETH A. POLITE, JR.
Assistant Attorney General

STEPHEN F. LEON GUERRERO
Assistant United States Attorney

LISA H. MILLER
Deputy Assistant Attorney General

MARIE L. MILLER

FRANCESCO VALENTINI
Trial Attorney

Special Assistant United States
   Attorney
United States Attorney's Office
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagåtña, Guam 96910
(671) 472-7332

Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on May 22, 2023, I filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a Notice of

Electronic Filing to all registered users.

Dated: May 22, 2023

FRANCESCO VALENTINI
Trial Attorney
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 11,800 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).


Dated: May 22, 2023

FRANCESCO VALENTINI
Trial Attorney
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov

# CERTIFICATE OF RELATED CASES

I hereby certify that the undersigned counsel for the United States is not aware of any related case, as defined in Ninth Circuit Rule 28-2.6, currently pending in this Court.

Dated: May 22, 2023

FRANCESCO VALENTINI
Trial Attorney
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov